IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

SHELTON FOSTER, #312239,       )
                               )
        Plaintiff,             )
                               )
v.                             )   CIVIL ACTION NO. 2:17-CV-835-WHA
                               )              (WO)
                               )
SOUTHERN HEALTH PARTNERS, et al., )
                               )
        Defendants.            )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I. INTRODUCTION[1]

This 42 U.S.C. § 1983 action is before the court on an amended complaint, Doc. 1-2, and amendment thereto, Doc. 4, filed by Shelton Foster, a pre-trial detainee confined in the Covington County Jail at the time relevant to the complaint. Foster initiated this case challenging the adequacy of medical treatment provided to him for numerous medical issues and various conditions he encountered during his confinement in the jail. Doc. 1-2 at 2–3. Foster names Southern Health Partners ("SHP"), the contract medical care provider for the Covington County Jail; Dr. Pamela Barber, Medical Director/Provider for the jail; Wanda Craft, a licensed practical nurse at the jail; and Alan Syler, the Jail Administrator, as defendants. Foster seeks a declaratory judgment, injunctive relief and monetary damages for the alleged violations of his constitutional rights. Doc. 1-2 at 7.

---

[1] All documents and page numbers cited are those assigned by the Clerk of this court in the docketing process.

The defendants filed answers, special reports and supporting evidentiary materials, including affidavits and certified medical records, addressing Foster's inadequate medical treatment and conditions claims.  In these documents, the defendants contend that Foster received appropriate treatment as determined by the jail's medical professionals and deny acting with deliberate indifference to Foster's medical needs. The defendants also maintain that the conditions of the jail about which Foster complains did not rise to the level of a constitutional violation.[2]

The court directed Foster to file a response to the arguments set forth by the defendants in their special reports and advised him that his response should be supported by affidavits or statements made under penalty of perjury and other appropriate evidentiary materials. Doc. 27 at 3–4. The order specifically advised the parties that "unless within fifteen (15) days from the date of this order a party files a response in opposition which presents sufficient legal cause why such action should not be undertaken . . ., the court may at any time [after expiration of the time for the plaintiff to file a response to the order] and without further notice to the parties (1) treat the special reports and any supporting evidentiary materials as a motion to dismiss or motion for summary judgment, whichever is proper, and (2) after considering any response as allowed by this order, rule on the motion in accordance with the law."  Doc. 27 at 4 (emphasis in original) (footnote omitted).  Foster filed a document on July 17, 2019, Doc. 62, which the court construed as his response to

---

[2]Although the defendants also raise Foster's failure to exhaust his administrative remedies as an affirmative defense, Foster disputes their contention and argues that the defendants simply did not respond at all to several of his grievances or adequately respond to the majority of his grievances and failed to provide him an opportunity to appeal the responses given to the grievances. The court will therefore address the merits of the claims presented by Foster.

the defendants' reports and provided him an opportunity to file any additional response he deemed necessary.  Doc. 64.  The response filed by Foster on July 17, 2019 is unsworn.[3]

Pursuant to the order previously entered in this case, the court deems it appropriate to treat the defendants' reports as motions for summary judgment. Upon consideration of the defendants' motions for summary judgment, the evidentiary materials filed in support thereof, and the sworn complaint, the court concludes that summary judgment is due to be granted in favor of the defendants.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (internal quotation marks omitted); Rule 56(a), Fed.R.Civ.P. ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits or properly sworn statements], which it

---

[3] This court cannot consider Foster's response to the special report because the response is not a sworn statement or one signed with an averment that it was made under penalty of perjury.  *See* 28 U.S.C. § 1746; *Holloman v. Jacksonville Housing Auth.*, 2007 WL 245555, *2 (11th Cir. Jan. 20, 2007) (noting that "unsworn statements, even from *pro se* parties, should not be considered in determining the propriety of summary judgment."); *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir. 1980) (holding that "the court may not consider [the pro se inmate plaintiff's unsworn statement] in determining the propriety of summary judgment.").  However, even if the court did consider this document, it would find that the defendants are still entitled to summary judgment.

believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (holding that moving party has initial burden of showing there is no genuine dispute of material fact for trial). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–24; *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (holding that moving party discharges his burden by showing the record lacks evidence to support the nonmoving party's case or the nonmoving party would be unable to prove his case at trial).

When the defendants meet their evidentiary burden, as they have in this case, the burden shifts to the plaintiff to establish, with appropriate evidence, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Rule 56(e)(3), Fed.R.Civ.P. ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, sworn statements, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]"); *Jeffery*, 64 F.3d at 593–94 (holding that, once a moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or statements made under penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact). In civil actions filed by inmates, federal courts "must distinguish between evidence of

disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted).  This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014); *Barker v. Norman*, 651 F.2d 1107, 1115 (5th Cir. Unit A 1981) (stating that a verified complaint serves the same purpose as an affidavit for purposes of summary judgment). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor such that summary judgment is not warranted. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007).  The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); *see also* Rule 56(e),R.Civ.P. 56(e).  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice[.]" *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).  Only disputes involving material facts are relevant and materiality is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248.

To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.  At the summary judgment stage, this court should accept as true "statements in [the plaintiff's] verified complaint, [any] sworn response to the [defendants'] motion for summary judgment, and sworn affidavit attached to that response[.]"  *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019); *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (holding that a plaintiff's purely self-serving and uncorroborated statements "based on personal knowledge or observation" set forth in a verified complaint or affidavit may create an issue of material fact which precludes summary judgment); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (citations omitted) ("To be sure, [Plaintiff's] sworn statements are self-serving, but that alone does not permit [the court] to disregard them at the summary judgment stage . . . .  Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.").  Nevertheless, general, blatantly contradicted and merely "[c]onclusory, uncorroborated allegations by a plaintiff in [his verified complaint or] an affidavit . . . will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion."  *Solliday v. Fed. Officers*, 413 F.App'x 206, 207 (11th Cir. 2011) (*citing Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).  In addition, conclusory allegations based on purely subjective beliefs of a

plaintiff and assertions of which he lacks personal knowledge are likewise insufficient to create a genuine dispute of material fact. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323–24; *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (holding that to establish a genuine dispute of material fact the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). "[T]here must exist a conflict in substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Group, Inc.*, 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citation omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although factual inferences must be viewed in a light most favorable to a plaintiff and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *See Beard*, 548 U.S. at 525. Thus, a plaintiff's *pro se* status alone does not compel this court to disregard elementary principles of production and proof in a civil case. Here, after a thorough review of all the evidence which would be admissible at trial, the court finds that

Foster has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the defendants.  *See Matsushita*, 475 U.S. at 587.

## III.  LEGAL STANDARD

The actions about which Foster complains occurred while Foster was a pretrial detainee confined in the Covington County Jail.  Foster's claims are therefore subject to review under the Due Process Clause of the Fourteenth Amendment, which prohibits the imposition of punishment on those who have not yet been convicted of a crime, rather than the Eighth Amendment's prohibition against cruel and unusual punishment, which governs claims of convicted inmates.  *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861 (1979); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996) ("Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners.").  "[I]n regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons."  *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985), *cert. denied*, 475 U.S. 1096 (1986).  As to these claims, the Eleventh Circuit has long held that "the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees." *Cottrell*, 85 F.3d at 1490; *Hamm*, 774 F.2d 1574 (holding that for analytical purposes, there is no meaningful difference between the analysis required by the Fourteenth Amendment and that required by the Eighth Amendment.); *Tittle v. Jefferson County Commission*, 10 F.3d 1535, 1539

(11th Cir. 1994) (observing that "[w]hether the alleged violation is reviewed under the

Eighth or Fourteenth Amendment is immaterial.").

> In a recent decision addressing a pretrial detainee's excessive force claim, the United States Supreme Court held that under the Fourteenth Amendment the detainee "must show only that the force purposely or knowingly used against him was objectively unreasonable... . A court must make this determination from the perspective of a reasonable [official] on the scene, including what that [official] knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, [576 U.S. 389, 397] 135 S.Ct. 2466, 2473 (2015). The court in *Kingsley* reaffirmed that a defendant "must possess a purposeful, a knowing, or possibly a [criminally] reckless state of mind. That is because ... 'liability for ***negligently*** inflicted harm is categorically beneath the threshold of constitutional due process.' *Id*. at [396,] 2472 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). The [*Kingsley*] Court further emphasized that the 'guarantee of due process has [historically] been applied to ***deliberate*** decisions of government officials to deprive a person of life, liberty or property.'" *Id*.

> The Supreme Court has not yet ruled on whether to extend the objective reasonableness standard of review set forth in *Kingsley* to cases of pretrial detainees which do not involve the use of excessive force (i.e., cases challenging medical treatment or conditions of confinement). However, an extensive search of post-*Kingsley* cases indicates that the vast majority of federal courts, including [this court and] the Eleventh Circuit Court of Appeals, have continued to utilize the deliberate indifference standard in deciding claims of pretrial detainees which challenge medical treatment and other conditions. *E.g*., *Massey v. Quality Correctional Health Care, Inc., et al.*, 2015 WL 852054 (M.D. Ala. Feb. 26, 2015), affirmed on appeal, [*Massey v. Montgomery County Detention Facility*, 646 F.App'x 777] (11th Cir. 2016) (addressing claims of a pretrial detainee challenging the medical treatment provided to him while in a county jail, without reference to *Kingsley*, and applying the deliberate indifference standard to find that the defendants' actions did not rise to the level of deliberate indifference); *McBride v. Covington County Health Auth.*, 2015 WL 3892715, *10 & 15–20 (M.D. Ala. June 24, 2015) (recognizing the impact of *Kingsley* on excessive force claims brought by pretrial detainees but subsequently applying the deliberate indifference standard to the plaintiff pretrial detainee's medical treatment claim) [*affirmed* 658 F.App'x 991 (11th Cir. 2016) (holding that district court properly applied the deliberate indifference standard of the Eighth Amendment in denying summary judgment to defendant on pretrial detainee's challenge to constitutionality of medical treatment provided for skin condition)]; *White v. Franklin*, 2016 WL 749063, at *5–8 (N. D. Ala. Jan. 28, 2016), adopted, 2016 WL 741962 (N.D. Ala.

Feb. 25, 2016) (applying *Kingsley's* objective reasonableness standard to pretrial detainee's claim of excessive force but addressing his claims of inadequate medical treatment under the deliberate indifference standard of the Eighth Amendment in accordance with prior Eleventh Circuit precedent); *Woodhouse v. City of Mount Vernon, et al.*, 2016 WL 354896, at *10 n.4 (S.D.N.Y. Jan. 26, 2016) (applying "a subjective standard to [detainee's] Fourteenth Amendment claim of deliberate indifference to serious medical needs, just as it would to an Eighth Amendment claim brought by a convicted prisoner," despite *Kingsley*); *Thomley v. Bennett, et al.*, 2016 WL 498436, at *7 (S.D. Ga. Feb. 8, 2016), adopted, 2016 WL 3454383 (S.D. Ga. Mar. 14, 2016) (finding *Kingsley* does not "provide[] the standard to be applied" to pretrial detainee's medical treatment claims).

As indicated above, the Eleventh Circuit recently applied the deliberate indifference standard to a pretrial detainee's claims challenging the constitutionality of medical treatment provided to him by health care personnel at a county jail.  *See Massey*, [646 F.App'x at 781].  In affirming the trial court's decision to grant summary judgment for the defendants, the Court held:

> There is ... no basis for [Plaintiff's] claim that [the defendant physicians'] diagnosis and treatment of his ailments rose to the level of deliberate indifference. There is a difference between "mere incidents of negligence or malpractice" and deliberate indifference. *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir.1991). The former, "while no cause for commendation, cannot ... be condemned as the infliction of punishment" in violation of the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 838, 114 S.Ct. 1970, 1979 (1994). The latter, by contrast, is a violation of the Eighth Amendment, but requires the plaintiff to prove that the defendant knew of a serious risk to the plaintiff and affirmatively disregarded it. *See McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). There is no genuine dispute that [the jail physicians] actively attempted to diagnose and treat [Plaintiff]. The treatment they offered may not have been as effective or instantaneous as [Plaintiff] would have liked, but the bare fact that treatment was ineffectual or not immediately administered does not mean that those responsible for it were deliberately indifferent. Because the record does not establish a genuine dispute that [the attending physicians] made a good-faith effort to treat [Plaintiff's] ailments, summary judgment was appropriate.

*Id*.  The Sixth, Seventh and Ninth Circuits are in accord.  *See Baynes v. Cleland*, 799 F.3d 600, 617–18 (6th Cir. 2015); *Smith v. Dart*, 803 F.3d 304,

310 (7th Cir. 2015); *Castro v. County of Los Angeles*, 797 F.3d 654, 664-65 (9th Cir. 2015).

*Smith v. Terry*, 2016 WL 4942066 at *3 (M.D. Ala. Aug. 15, 2016) (recommendation adopted as opinion of the court, 2016 WL 4923506) (M.D. Ala. Sept. 14, 2016); *Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1279 (11th Cir. 2017) (holding that a pre-trial detainee's "claims are evaluated under the same [deliberate indifference] standard as a prisoner's claim of inadequate care under the Eighth Amendment" and specifically refusing to extend the objective reasonableness standard set forth in *Kingsley* to such claims).

Other district courts post-*Kingsley* have also applied the deliberate indifference standard of the Eighth Amendment in deciding medical claims presented by pretrial detainees.  *See Oliver v. County of Gregory*, 2016 WL 958171, at *6 n.11 (D. So. Dakota Mar. 8, 2016) (noting that the holding in *Kingsley* "was limited to excessive force cases under the Fourteenth Amendment as set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994). Thus, the Eighth Circuit still utilizes the subjective measure of deliberate indifference . . . for pretrial detainees in Fourteenth Amendment cases involving an allegation of deprivation of medical care."); *Hall v. Ramsey County*, 801 F.3d 912, 917 n.3 (8th Cir. 2015) (noting *Kingsley's* holding in discussion of pretrial detainee's excessive force claim and then applying subjective prong of deliberate indifference to his deprivation of medical care claim.); *Figueira by and through Castillo v. County of Sutter*, 2015 WL 6449151 (E.D Calif. Oct. 23, 2015) (holding that despite *Kingsley* pretrial detainee "must show the defendants acted with deliberate indifference to his serious medical needs[]" as required by prior Ninth Circuit law applying same legal standard to Eighth and Fourteenth

Amendments claims challenging conditions, including those alleging a denial of adequate medical treatment); *Gilbert v. Rohana*, 2015 WL 6442289, at *4 (S.D. Ind. Oct. 23, 2015) (finding "that *Kingsley* did not alter the legal standard for denial of medical treatment claims brought by pretrial detainees like Plaintiff.  *Kingsley* was limited to excessive force claims brought by pretrial detainees; the Court did not comment on the appropriate standard for denial of medical treatment claims brought by such detainees."); *Larson v. Stacy*, 2015 WL 5315500, at *6–9 (N.D. Ala. Aug. 18, 2015), recommendation adopted as opinion of the court, 2015 WL 7753346 (N.D. Ala. Dec. 2, 2015) (court use objective reasonableness standard to address pretrial detainee's excessive force claims but applied deliberate indifference standard to his medical care claims); *Johnson v. Hodgson*, 2015 WL 5609960, at *5 (D. Mass. Sept. 22, 2015) (court acknowledged application of *Kingsley* to pretrial detainee's excessive force claim but stated deliberate indifference standard was proper standard for review of his inadequate medical treatment claims); *Landy v. Isenberg*, 2015 WL 5289027, at *4 (D. Md. Sept. 9, 2015) (same); *Wells v. T.C.C.F.*, 2015 WL 4875872, at *2 (N.D. Miss Aug. 15, 2015) (recognizing that under *Kingsley* "[m]ere negligence . . . will not support the finding of a constitutional violation" on a pretrial detainee's challenge to medical care and then finding that to proceed on such a claim "a detainee must demonstrate" each of the elements of deliberate indifference); *Roberts v. C-73 Medical Director*, 2015 WL 4253796, at *3 (S.D. N. Y. July 13, 2015) ("The decision in *Kingsley* dealt only with excessive force claims, thus [this] Court continues to abide by Second Circuit precedent setting forth a subjective standard for cases involving allegations of deliberate indifference to a pretrial detainee's serious medical needs."); *Kennedy v. Bd. of Commissioners for Oklahoma County*, 2015 WL 4078177, at *1 n.6 (W.D. Okla. July 6,

2015) (holding that the Supreme Court's decision in *Kingsley* "does not alter the [deliberate indifference] standard applicable to medical care claims" of pretrial detainees.); *Austin v. County of Alameda*, 2015 WL 4051997 at *3 (N.D. Cal July 2, 2015) (same).

Based on the foregoing authorities, the court will apply the deliberate indifference standard to Foster's claims of inadequate medical treatment and unconstitutional conditions instead of the objective reasonableness standard applied to the excessive force claim before the court in *Kingsley*.[4]

## IV.  DISCUSSION

In the pleadings before this court, Foster asserts that the medical defendants denied him adequate medical treatment for numerous medical conditions while he has been incarcerated in the Covington County Jail including neck, head, back and shoulder pain; deep vein thrombosis; chronic obstructive pulmonary disease; anxiety; nausea; diabetes; allergies; high blood pressure; depression; infections; asthma; cardiac disease; scabies; congestion; skin rashes; earaches; urinary problems; skin lesions; hemorrhoids; retinal detachments; lung cancer; and an injury to his voice box. Foster also alleges that jail administrator Alan Syler refused to intervene regarding the treatment provided by medical personnel and also failed to ensure that Pliantiff received adequate outdoor exercise, refused him access to his medical records, and failed to provide proper seating at one visitation session. As discussed in detail below, Foster fails to demonstrate a genuine dispute of material fact sufficient to preclude entry of summary judgment in favor of the defendants.

---

[4]Under the facts of this case as set forth below, the court further finds that, regardless of the standard applied — deliberate indifference or objective reasonableness — Foster's claims do not survive summary judgment.

## A.  Deliberate Indifference to Medical Needs

To prevail on a claim concerning an alleged denial of adequate medical treatment, an inmate must show that the defendants acted with deliberate indifference to his serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000);  *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986).  Specifically, jail and medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (citation and internal quotations omitted) (As directed by *Estelle*, a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment.)"

To demonstrate an Eighth Amendment violation, a prisoner must satisfy both an objective and a subjective standard. *Farmer*, 511 U.S. at 834; *Keohane v. Fla. Dept. of Corrections Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020) (internal citations and quotations omitted) (holding that "[a] deliberate-indifference claim entails both an objective and a subjective component. First, the inmate must establish an objectively serious medical need—that is, one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention—that, if left unattended, poses a substantial risk of serious harm.  Second, the inmate must prove that prison officials acted with deliberate indifference to that need by showing (1) that they had subjective knowledge of a risk of serious harm and (2) that they

disregard[ed] that risk (3) by conduct that was more than mere negligence."); *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (holding that the law requires establishment of both objective and subjective elements to demonstrate an Eighth Amendment violation). With respect to the objective element, an inmate must first show "an objectively substantial risk of serious harm . . . exists. Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh v. Butler Cnty., Ala*., 268 F.3d 1014, 1028–29 (11th Cir. 2001), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). As to the subjective element, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837–38; *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838).

> That medical malpractice—negligence by a physician [or other medical provider]—is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105–07, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison [medical provider's] harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833–38, 114 S.Ct. 1970, 1977–79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to set forth a cognizable claim of "deliberate indifference to [a] serious medical need . . ., Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009). When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (holding that for liability to attach a defendant must know of and then disregard an excessive risk to prisoner's health or safety). Regarding the objective component of a deliberate indifference claim, the plaintiff must first show "an objectively 'serious medical need[]' . . . and second, that the response made by [the defendants] to that need was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnos[is] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor*, 221 F.3d at 1258 (internal citations omitted). This is likewise true for a claim reviewed under the objective reasonableness standard.

When challenging the constitutionality of medical care under either standard of review, "[t]he facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, [or] poor exercise of medical judgment. *Estelle*, 429 U.S. at 104–07, 97 S.Ct. 285. An allegation of negligence is [likewise] insufficient to state a due process claim. *Daniels v. Williams*, 474 U.S. 327, 330–33, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)." *Simpson v. Holder*, 200 F.App'x 836, 839 (11th Cir. 2006); *Green v. Watson*, 2015 WL 4609977, at *2 (S.D. Ill. July 31, 2015) (Due to "the state of mind requirement for all due

process violations[,] . . . medical malpractice and negligence claims are not actionable under [42 U.S.C.] § 1983, but are the grist of state law.); *Kingsley*, 576 U.S. at 395–96, 135 S.Ct. 2472 (With respect to the "legally requisite state of mind" attendant to a defendant's physical acts in determining the objective reasonableness of such acts, "the defendant must possess a purposeful, a knowing, or possibly a [criminally] reckless state of mind.  That is because . . . 'liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.'") (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1999); *Estelle*, 429 U.S. at 106 (neither negligence nor medical malpractice "become[s] a constitutional violation simply because the victim is incarcerated."); *Farmer*, 511 U.S. at 835–36 (A complaint alleging negligence in diagnosing or treating "a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment[,]" nor does it establish the requisite reckless disregard of a substantial risk of harm so as to demonstrate a constitutional violation.); *Daniels*, 474 U.S. at 332 (The Constitution "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries. . . .  We have previously rejected reasoning that would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States.") (internal quotations omitted); *Kelley v. Hicks*, 400 F.3d 1281, 1285 (11th Cir. 2005) ("Mere negligence . . . is insufficient to establish deliberate indifference."); *Matthews v. Palte*, 282 F.App'x 770, 771 (11th Cir. 2008) (affirming district court's summary dismissal of inmate complaint alleging "misdiagnosis and inadequate treatment [as such] involve no more than medical negligence."); *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) ("[A] plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an

ailment."); *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that negligence in misdiagnosis of pituitary tumor not sufficient to show deliberate indifference); *Barr v. Fla. Dept. of Corr.*, 2011 WL 1365552, at *4 (S.D. Fla. April 11, 2011) (finding that plaintiff due no relief where misdiagnosis, which led to improper insertion of feeding tube, did not rise to the level of deliberate indifference as misdiagnosis amounted to nothing more than negligence); *Null v. Mangual*, 2012 WL 3764865, at *3–4 (M.D. Fla. Aug. 30, 2012), appeal dismissed (11th Cir. 12-14749 Nov. 28, 2012) (finding that misdiagnosis of inmate with Ganglion cyst that "was eventually diagnosed as synovial sarcoma, a form of skin cancer [leading to a later discovery of] multiple spots of cancer on his lungs . . . fail[ed] to show that Defendants acted with deliberate indifference as opposed to mere negligence. . . .  At most, [Defendants] misdiagnosed Plaintiff's growth, which amounts to a claim of negligence or medical malpractice."); *Payne v. Groh*, 1999 WL 33320439, at *5 (W.D. N.C. July 16, 1999) (citing *Sosebee v. Murphy*, 797 F.2d 179 (4th Cir. 1986)) ("An allegation of misdiagnosis, even when accompanied by a speculative allegation of subjective intent, amounts only to the state-law tort of medical malpractice, not to a tort of constitutional magnitude for which Section 1983 is reserved.  Conclusory allegations sounding in malpractice or negligence do not state a federal constitutional claim.").  In addition, *Kingsley's* requirement of a purposeful or knowing state of mind, its assertion that due process protects only against deliberate acts and its affirmation that negligence categorically fails to provide a basis for liability in section 1983 actions, 576 U.S. at 396, 135 S.Ct. at 2472, serves to preclude the constitutionalization of medical malpractice claims such as those which allege misdiagnosis or negligent treatment of a condition.  Consequently, merely accidental inadequacy, negligence in diagnosis,

negligence in treatment, and medical malpractice do not suffice to establish the objective component of claims seeking relief for alleged constitutional violations regarding medical treatment provided to an inmate, whether he is a pretrial detainee or convicted prisoner.

Additionally, "to show the required subjective intent . . ., a plaintiff must demonstrate that the public official acted with an attitude of deliberate indifference . . . which is in turn defined as requiring two separate things: aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists [] and . . . draw[ing] of the inference[.]" *Taylor*, 221 F.3d at 1258 (internal quotation marks and citations omitted) (alterations in original). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. When medical personnel attempt to diagnose and treat an inmate, the mere fact that the chosen "treatment was ineffectual . . . does not mean that those responsible for it were deliberately indifferent." *Massey v. Montgomery County Detention Facility*, 646 F.App'x 777, 780 (11th Cir. 2016).

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.' *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291; *Mandel,* 888 F.2d at 787. Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' *Rogers,* 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 ('Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'); *Mandel*, 888 F.2d at 787–88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258 (citation and internal quotations omitted) (To show deliberate indifference to a serious medical need, a plaintiff must demonstrate that [the] defendants' response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law."). Moreover, "as *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal quotation marks omitted). "A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation." *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that mere fact inmate desires a different mode of treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662

F.2d 1337, 1344 (9th Cir. 1981) (holding that prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient). "Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records." *Whitehead v. Burnside*, 403 F.App'x 401, 403 (11th Cir. 2010) (citing *Bennett v. Parker*, 898 F.2d 1530 (11th Cir.1990)).

The law is likewise clear that an inmate is not entitled to referral to an outside physician for evaluation. *Amarir v. Hill*, 243 F.App'x 353, 354 (9th Cir. 2007) (holding that defendant's "denial of plaintiff's request to see an outside specialist . . . did not amount to deliberate indifference."); *Arzaga v. Lovett*, 2015 WL 4879453, at *4 (E.D. Cal. Aug. 14, 2015) (finding that plaintiff's preference for a second opinion is "not enough to establish defendant's deliberate indifference" as the allegation does "not show that defendant knowingly disregarded a serious risk of harm to plaintiff" nor that defendant "exposed plaintiff to any serious risk of harm."); *Dixon v. Jones*, 2014 WL 6982469, at *9 (M.D. Ala. Dec. 9, 2014) (finding that jail physician's denial of second opinion regarding treatment provided to inmate for physical injuries did not constitute deliberate indifference); *Youmans v. City of New York*, 14 F.Supp. 357, 363–64 (S.D.N.Y. 2014) (noting that "courts in the Second Circuit have held that failure to provide a second opinion is not generally a violation of a prisoner's Eighth Amendment rights."); *Schomo v. City of New York*, 2005 WL 756834, at *10 (S.D.N.Y. Apr. 4, 2005) (finding doctor's decision to deny inmate second opinion did not constitute deliberate indifference "since prisoners are not constitutionally entitled to a second medical opinion.").

## 1.  <u>The Medical Defendants</u>

Foster complains that defendants SHP, Barber, and Craft denied him treatment for numerous medical conditions during his incarceration at the Covington County Jail. Doc. 1-2 at 1–6. The medical defendants deny that they acted with deliberate indifference to Foster's medical needs during the time relevant to this complaint and maintain that Foster had continuous access to health care personnel and received treatment from medical professionals for his complaints during this time. The medical records before the court demonstrate that medical personnel at the Covington County Jail evaluated Foster each time he appeared at the medical unit for complaints related to his numerous medical issues, assessed his need for treatment, prescribed medications to treat his conditions, ordered tests and studies to assist in treating Foster, and provided treatment to Foster in accordance with their professional judgment. Doc. 26-7 at 2–88 & Doc.26-8 at 2–166. These records further show that the jail's medical personnel referred Foster for treatment at free world facilities when they deemed off-site treatment necessary.

The defendants submitted affidavits in response to the complaint filed by Foster. After a thorough review of the medical records submitted in this case, the court finds that the details of medical treatment provided to Foster as set forth by the defendants in their affidavits are corroborated by the objective medical records contemporaneously made during the treatment process.

Defendant Craft responds to the claims presented by Foster, in pertinent part, as follows:

A.     **BACKGROUND INFORMATION**

. . . .

When a patient in the Jail requires routine medical care, he or she obtains a Patient Sick Call Slip ("Sick Call Slip") from the corrections officer on duty in the housing unit and that form is provided to the medical staff for action. Routine sick calls are conducted by the medical staff inside the housing unit.

Nurses in the Jail are authorized to provide medical treatment and to administer medication by implementing provider's orders under the direction of the Medical Director/Provider. The Medical Director/Provider generally visits the Jail at least once per week to provide medical care to inmates.

The Medical Director/Provider is available to the nurses at all times for consultation. If a patient requests or needs to be seen by a doctor, a nurse will place the patient on the Provider list, and will set aside the patient's chart for the Medical Director/Provider to review. On his or her next visit to the Jail, the Medical Director/Provider will review the patient's charts and review the treatment provided by the nurses. The Medical Director/Provider will determine which patients need to be seen, and will see those patients in the Jail medical office. In the event that any changes need to be made to a patient's medical treatment, the Medical Director/Provider will enter new medical orders at that time. The nurses then implement his or her medical orders.

During the time I have been employed by SHP, Plaintiff has received medical attention for every medical condition which he has brought to the attention of Jail personnel.

Nurses at the Jail have no authority to prescribe medications. All medications provided by nurses to the Plaintiff at the Jail are prescribed by the Medical Director/Provider, whose prescribing and dosage instructions were followed by the nurses at the Jail.

The SHP medical staff and I have provided Plaintiff with all of the medications, treatments, outpatient visits, and other medical care ordered by the Medical Director/Providers.

Nurses at the Jail are not authorized to refer patients to medical specialists. They are responsible for evaluating whether a patient needs to be seen by the Medical Director/Provider, and placing the patient on the Provider list for evaluation by the Medical Director/Provider. Only the Medical Director/Provider is authorized to refer a patient to a medical specialist. Once the Medical Director/Provider has issued orders for a patient to be seen by a specialist, the nurses carry out those orders by arranging appointments and transportation for the patient.

Neither I nor any SHP medical personnel have ever denied Plaintiff access to his medical records. Nurses in the Jail are not authorized to provide copies of medical records directly to patients who are incarcerated in the Jail. Patients are allowed, upon request, to review their medical records in the presence of a member of the medical staff; however, they may not make any changes to the records. They may obtain copies of the records by submitting a written request to SHP at its corporate office.

Copies of Plaintiff's medical records from Andalusia Hospital were provided to SHP by Jail personnel, and were made part of Plaintiff's medical chart. I have explained to Plaintiff that he may obtain copies of these records and of all medical records in his chart by contacting SHP, and sending them a release. To my knowledge, he has never contacted SHP to obtain copies of his records.

I have never denied or improperly delayed medical treatment to the Plaintiff.

Based upon my treatment of the Plaintiff and review of his medical records, it is my opinion that all treatment provided to the Plaintiff by myself and the SHP nursing staff was prompt, appropriate and within the standard of care. On no occasion was the Plaintiff ever denied medical care, nor was any member of the medical staff ever indifferent to any of the Plaintiff's medical needs.

## B.   CHRONOLOGY OF PLAINTIFF'S TREATMENT

Plaintiff was booked into the [Covington County] Jail for Capital Murder on September 14, 2012, and was discharged on January 29, 2018. During the time he was in the Jail, the medical staff provided Plaintiff with extensive medical care for numerous medical conditions, including deep vein thrombosis, chronic obstructive pulmonary disease, headaches, anxiety, nausea, diabetes, pain, allergies, high blood pressure, depression, infections, asthma, cardiac disease, scabies, congestion, skin rashes, earaches, urinary problems, skin lesions, hemorrhoids, retinal detachments, and lung cancer. They also provided him with replacements for his TEP (voice prosthesis), which he had used since a previous laryngectomy for neck cancer.

Throughout his incarceration in the Jail, Plaintiff was seen regularly in the Chronic Care Clinic. Patients with certain chronic health conditions such as hypertension and diabetes are seen regularly by the nurses and the Jail Medical Director/Provider, and the patients are monitored as to their vital signs, medications, medication compliance, special diets, condition control, and laboratory data.

While in the Jail, Plaintiff was provided many visits with numerous outside specialists, including Ear, Nose and Throat specialists (ENT), a pulmonologist, a cardiologist, an oncologist, an optometrist and an ophthalmologist. He was seen in the hospital emergency room on multiple occasions. He was provided extensive outside testing, including x-rays, EKGs, PET scans, CT scans, ultrasounds, heart and lung tests and blood tests. He underwent eye surgery three times, and also underwent lung surgery for lung cancer. The medical staff at the Jail provided all necessary follow-up care after each surgery and procedure.

It is my understanding that the Plaintiff has alleged that Dr. Barber, SHP and I denied him medical attention that was prescribed by an ER doctor at Andalusia Hospital on June 4, 2017. Neither I nor Dr. Barber or any of the SHP medical staff denied Plaintiff any reasonably necessary medical attention arising from that incident.

On the evening of June 4, 2017, correctional officers contacted me by telephone, and informed me that Plaintiff was coughing up large amounts of rust colored fluid. I called Dr. Barber, who directed that Plaintiff should be transported to the emergency room. I then relayed these instructions to the Jail staff.

Plaintiff was transported by Jail personnel to Andalusia Regional Hospital, where he was seen by Dr. Michael Proctor. According to the medical records, Dr. Proctor found that Plaintiff had slightly labored breathing due to a mucus plug in his tracheostoma (the opening from his neck into the trachea). Dr. Proctor performed oropharyngeal suction of the mucus, which resulted in marked improvement and resolution of the symptoms. He recommended normal saline for tracheostomy irrigation and suction, as needed, and also recommended surgical replacement of Plaintiff's prosthesis. He did not prescribe any medications. Plaintiff was discharged with instructions on cleaning and care of tracheostomies.

On June 6 and 7, 2017, I repeatedly attempted to locate a physician who would perform the prosthesis replacement procedure that Dr. Proctor had recommended. After six different physicians refused to see Plaintiff, I finally located Dr. Richard Waguespeck, who agreed to see him at the Kirkland Clinic in Birmingham on June 23, 2017.

Plaintiff was seen in the Chronic Care Clinic on June 7, 2017. His blood pressure was 120/80, temperature was 97.7, pulse was 85, respirations were 20, and his weight was 188.0. No issues were identified regarding his chronic health conditions.

On the afternoon of June 7, 2017, I received a note from Plaintiff that stated, "You can let Wanda know, also Allan that I will let wife know to contact attorney to enforce court order to file contempt, I am not playing their dam waiting game till the end of month for an ENT that can't fix the pothesis, or follow up as the ER physician order stated for Dr. Barber to do Monday. Now have to take another chance with my life, N ER As Sunday night – End of dam games"(*sic*.).

I suctioned Plaintiff's tracheostomy on June 10, 2017 and June 12, 2017, as per Dr. Proctor's recommendation, and obtained only a small amount of clear mucus.

On June 23, 2017, Dr. Waguespeck's office rescheduled Plaintiff's appointment to June 27, 2017.

On June 25, 2017, Dr. Barber saw Plaintiff in the Jail medical office. Plaintiff complained of being stressed and depressed. He also complained of a rash behind his ears and on his legs, which he stated had come and gone for three years. Dr. Barber reviewed with Plaintiff his liver function test results, and explained how they compared to his 2016 tests.

On June 27, 2017, Plaintiff was transported to Birmingham, where Dr. Waguespeck performed a prosthesis replacement, as had been recommended by Dr. Proctor.

In June 2017, I and the SHP nursing staff provided Plaintiff the following medications, in compliance with orders from Dr. Barber: Xopenex Inhaler twice daily (for COPD), Albuterol Sulfate nebulizer three times daily (for COPD), Aspirin 81 mg by mouth once per day (for heart disease); Aleve 440 mg, two tablets twice per day (anti-inflammatory); Keflex 500 mg by mouth twice per day through June 4th (antibiotic), Clopidogrel Bisulfate 75 mg, one tablet by mouth per day (for heart disease), Vistaril 50 mg by mouth, one dose on June 25 (for anxiety), Vistaril 25 mg by mouth, twice per day for seven days starting June 25, 2017, viscous lidocaine 2% for oral rinse twice per day for fourteen days starting June 26, 2017 (for prosthesis surgery), Tamsulosin HCL 0.4 mg, one capsule by mouth every night at bedtime (for prostate enlargement), Lisinopril 5 mg, one tablet by mouth each day (for hypertension and heart disease), Topiramate 25 mg, three tablets by mouth twice daily (for anxiety, depression and migraines), Gabapentin 300 mg one capsule by mouth twice daily (for nerve pain), Isosorbide Mono ER 30 mg, on[e] tablet by mouth per day (for heart disease), Pantoprazole Sodium 40 mg, one tablet by mouth per day (for acid reflux), Budesonide 0.25 mg via nebulizer twice daily (for COPD), Humulin (insulin) twice daily by injection (for diabetes). His blood sugar and blood pressure were checked twice daily on a regular basis.

It is my understanding that Plaintiff has alleged that Dr. Barber, SHP and I violated his 8th amendment rights by various acts allegedly committed during the month of September 2017.

On the morning and evening of September 2, 2017, I provided Plaintiff with fourteen different medications to be taken by mouth, with three medications by inhalation through a nebulizer, and two medications by injection. I also checked his blood sugar at 5:00 p.m. Plaintiff was seen in the Jail medical office that evening by a different nurse, Nurse Capps. Plaintiff complained to Nurse Capps about his eyes and a rash. Nurse Capps checked Plaintiff's vital signs, examined him, and completed a Clinical Pathway Form. She noted no significant changes to his condition.

On Sunday, September 3, 2017, I checked Plaintiff's blood sugar at 7:00 a.m. His blood sugar at that time was 209, so I administered four (4) units of insulin by injection to correct the problem. Later that evening, Plaintiff was brought to the Jail medical office, complaining of neck and back pain. He was seen by Nurse Brenda Capps, and he told her that he had fallen in the visitation area. Nurse Capps observed that Plaintiff's blood pressure was 126/74, pulse was 84, oxygen saturation was 96%, and temperature was 98.4. Nurse Capps noted that she examined Plaintiff and found no areas of redness, swelling or open wounds. Plaintiff was able to ambulate, and he had a steady gait and balance. He had a full range of motion and was able to move all extremities.

On Monday, September 4, 2017 (Labor Day), Plaintiff submitted a sick call request stating, "Fell Sat. in visitation rm, hurting in neck into left shoulder area, now numbness in left arm, hand, & lower back hurting, pain shooting into right hip area. Headaches has gotten worst, told nurse Sat @ approx… 3:40 pm right after incident OK bad Press set & standing, HR, oxy, ck weight suppose to been [to] Dr 9/3/17 (same as last Sunday no show) no concern for my previous condition plan this new one."(sic.).

On September 4, 2017, the SHP weekend nurse, Latarya Ortega, saw Plaintiff in the Jail medical office. Plaintiff reported that he was in pain, and that he was feeling tingling and numbness in his arms and hand. He also stated that he felt pain radiating into his right leg from his left arm. The nurse noted that Plaintiff's blood pressure was 150/100, temperature was 98.6, pulse was 86, and oxygen saturation was 99 %.

On September 4, 2017, Nurse Ortega contacted me by telephone and informed me of Plaintiff's complaints. I contacted Dr. Barber, who issued medical orders for Plaintiff to be transported to the emergency room. I relayed Dr. Barber's orders to Nurse Ortega.

On September 4, 2017, Jail personnel transported Plaintiff to the emergency room at Andalusia Regional Hospital. A physical examination showed that Plaintiff was alert and in no acute distress. Range of motion in the neck and extremities was normal. Gait was steady, at a normal pace without difficulty. He exhibited pain with movement of the lower back. X-rays of his lumbar spine showed multi-level spondylosis. CT scans of the lumbar spine showed multi-level lumbar [spondylosis] with neural foraminal stenosis and central spinal stenosis at several levels. No fractures were noted. He was discharged with a diagnosis of "low back pain", and was given written prescriptions for the following medications:  Anaprox DS (anti-inflammatory), 550 mg, one tablet by mouth every twelve hours as needed, and cyclobenzaprine (muscle relaxer), 10 mg every eight hours.

I did not work at the Jail on September 4th, 5th, or 6th, 2017.

On September 7, 2017, upon my return to the Jail, I contacted Dr. Barber, and obtained medical orders to provide Plaintiff with Tylenol (for pain) 650 mg by mouth twice per day for ten days, and Flexeril (muscle relaxer) 10 mg, one tablet by mouth twice per day for ten days. Because the medical office had Tylenol in stock, I began providing Plaintiff with the Tylenol on the evening of September 7, 2017.  Because the Flexeril was not kept in stock, I had to order it from the pharmacy. I began providing Plaintiff with the Flexeril on September 10, 2017, the day it arrived from the pharmacy.

Plaintiff signed his original Complaint ("Civil Action") in this lawsuit on September 7, 2017.

On September 8, 2017, Plaintiff was heard yelling through his cell door at the Jail Sergeant that he had been experiencing a rash for the last four weeks. He yelled that he wanted to see Lt. Syler, or he was going to sue. Plaintiff was brought to the Jail medical office, and I observed that the only signs of a rash were on his face. I had seen Plaintiff in the Jail medical office on August 17, 2017, at which time he had a similar rash, which he said had been caused by shaving too closely. The rash I observed on September 8, 2017, appeared similar, and was probably caused by shaving too closely again.

On September 13, 2017, Plaintiff submitted a sick call request, stating, "Passing blood through rectum, cramping n stomach, knot in stomach same from sick call 3 wks ago not seen yet, diareaha, being refused proper medical care by nurse@SHP, also been seen by witnesses Stg Rick Brooks passing blood yesterday wanda seen sample. Also requested for blood sample to be seen by LT Sylan gave to STG Rick"(*sic*.)

On September 14, 2017 Nurse Brittany Mullen and I saw Plaintiff in the Jail medical office for sick call and for a chronic care visit. Nurse Mullen completed a clinical pathway form. Plaintiff's blood pressure was 150/82, pulse was 98, respirations were 20, oxygen saturation was 99%, and temperature was 98 degrees. He was alert and oriented, and his pupils were equal and reactive. His abdomen was soft, skin was warm and dry, and respirations were even and unlabored. Plaintiff complained of bleeding from his rectum. He presented us with some tissue paper that contained a small amount of blood and mucous. H[e] complained of stomach cramps that he rated as a pain level of 6 out of 10. I informed him that he probably had hemorrhoids, since he had complained of diarrhea the day before. I noted that his stomach pain was the same pain he had reported before, which had been shown by x-rays to be gas. I informed him that he had been put on the doctor list, and I placed his chart for review by Dr. Barber at her next jail visit.

After I left the Jail on September 14, 2017, Plaintiff went to Lt. Alan Syler's office and informed him that medical had not been "doing anything for him" for three weeks.

On September 15, 2017, upon being informed of Plaintiff's complaint, I noted that Plaintiff had been seen in the emergency room on September 4, 2017 with no significant medical findings. I contacted Dr. Barber, who issued medical orders for Bentyl (an anti-spasmodic medication) 20 mg, one tablet by mouth twice per day for fourteen days.

On September 17, 2017, Dr. Barber reviewed Plaintiff's medical chart, and noted, "Complains of having blood per rectum which is probably due to hemorrhoids. So will continue to monitor."

I have visually inspected Plaintiff's rectum on at least one occasion since September, 2017, and have confirmed the presence of hemorrhoids.

Later on September 17, 2017, Plaintiff submitted a sick call request, stating, "why wasn't I seen by dr today for issues on sick calls I have put n over the last month [o]r so, rash, hurting [i]n neck to left shoulder & arm from the fall on 9-2-17, knot [i]n stomach, swallowing issues, eyesight blurring, the pet-scan follow-up yearly check, on all issues plus the enlarged prostrate, a grevience as been sent to lt. allan, with dates & issues. Possibility of risk of cancer increase to liver due to hep. C, being not treated while here with Tylenol adding to the problem."(*sic*.).

On September 17, 2017, Plaintiff submitted a grievance, which was forwarded to the medical staff. It stated, "Lt. Sylan, seems your medical cares less about following up on health issues, your Dr. showed today, wasn't seen

again. Complaint on was suppose to be seen 8/20/17 – 8/27/17 – 9/3/17 – 9/10/17 – 9/17/17 still nothing. Also it seems the inquiries filled out on kiosk aren't of any matter either, from 9-1-17 there are several that hasn't been answered, request, grievances, etc. Why are your medical personal guessing at problems instead of trying to find out truth of problem. I find that refusing of proper medical attention is also malpractice to throw pills w/o finding the problem first then also to give Tylenol that can danger a liver of someone that is susceptible to cancer that has high level of Hep C due to refusal of treatment – Why this grievance & request on kiosk since 9/1/17 aren't answered.  [Foster also submitted the following complaints:]

On 9-4-17 sent a sick call about hurting n neck to left shoulder & arm, ect. (that ER didn't check) was told was on list to B seen by Dr. (Ended in ER) for both neck & back

9/13/17 another sick call for passing blood out of rectum, cramping etc., claimed it was Hemerods, never had in my life, plus no one chkd anything, again was on list to see Dr 9/17/17 Dr. was here wasn't seen

8/31/17 Sick call eye sight problem, rash keeps coming back, knot in stomach, trouble swallowing, request for yearly PET scan to ck hot spots shown 9/9/16 scan & make sure of liver Hep C hasn't turn to cancer w/ high level that has been refused treatment from you medical staff, now giving Tylenol to me which is/could make things [worse] w/ liver was suppose seen Dr 9/3/17 nothing

7/26/17 problem w/ continued kidney infection, was on list according to head nurse 8/27/17 & 8/20/17 (No Dr either) Seems Southern Health Partners Head Nurse is not being truthful or I'm being refused treated by their Dr. Pamela Barber (who is the problem here)

Seeking Professional medical attention, that don't believe N prolonging pain & surfering as your medical personael does – or doesn't care about 8th Amendment Right violated over & over & quit guessing at possible problem or what is real or not" (*sic*).

On September 18, 2017, I saw Plaintiff in the Jail medical office. I completed a clinical pathway form. Plaintiff's blood pressure was 160/90, pulse was 104, respirations were 20, oxygen saturation was 96%, and temperature was 96.5 degrees. He was alert, oriented, calm and cooperative and his pupils were equal and reactive. His grips and pedal pulses were good, abdomen was soft, skin was warm and dry, and respirations were even and unlabored. Plaintiff complained of a knot in his stomach; I noted that tests had revealed it was gas. Plaintiff stated that he wanted a pet scan. He had been carrying around a piece of tissue paper with blood on it. I observed no fecal material on the tissue, only a mucous-like substance. He claimed that he had a rash on his chest, and wanted his esophagus dilated. He became angry because the doctor would not see him the previous day. I informed him that he should notify nursing if his conditions worsened.

On September 18, 2017, after Plaintiff left the medical office, I was informed by another inmate that Plaintiff had been rubbing himself with a dry washcloth to cause a rash. He had also been walking around the cell block and playing cards, with no complaints of pain. The other inmate reported that Plaintiff had gotten upset when he could not convince an inmate with heart problems to file a lawsuit.

On September 19, 2017, Dr. Barber issued medical orders to increase Plaintiff's dosage of lisinopril to 5 mg, two tablets twice per day.

On September 20, 2017, Plaintiff submitted a sick call request, stating, "still having trouble swallowing, sore knot on neck & gums". He also submitted a sick call stating, "hurting in neck to left shoulder headache is worst, feet turning blue, feel like walking on pins, needles, eyesight blurring in right eye, also still hurting in lower back somewhat, still sore in stomach right side where knot is"(*sic*.).

On September 22, 2017, I saw Plaintiff in the Jail medical office, and I completed a clinical pathway form. Plaintiff's blood pressure was 140/90, pulse was 93, respirations were 20, oxygen saturation was 99%, and temperature was 97.4 degrees. He was alert, oriented, calm and cooperative and his pupils were equal and reactive. His abdomen was soft, his skin was warm and dry, and his respirations were even and unlabored. Plaintiff complained of headache, difficulty swallowing, and numbness, pain and tenderness in his legs and feet. He stated that it had taken him an hour to eat a bologna sandwich. I observed that both sides of his feet were purple/blue in color. He stated that he rubbed his feet 3 to 4 times per day hard, to warm them up. He added that his right foot had been crushed. He wanted his esophagus dilated, and wanted a PET scan. He also stated that he had difficulty urinating at times. I informed him to notify nursing if his condition worsened. I contacted Dr. Barber, who issued medical orders for Indocin 25 mg, one tablet by mouth once per day. She also ordered a urine test.

On September 23, 2017, a urine test was performed by Nurse Fuller. The test was negative, except for positive nitrite, amber color, and a large amount of sediments.

On September 26, 2017, Plaintiff submitted a sick call request, stating, "hurting bad in my back & abdomen, neck to my left arm, still in stomach where knot is" (*sic*.).

On September 27, 2017, I saw Plaintiff in the Jail medical office, and I completed a clinical pathway form. Plaintiff's blood pressure was 178/90, pulse was 89, respirations were 20, oxygen saturation was 99%, and

temperature was 97.3 degrees. He was alert, oriented, calm and cooperative and his pupils were equal and reactive. His abdomen was soft, his skin was warm and dry, and his respirations were even and unlabored. Plaintiff complained of generalized pain all over. He stated that he had pain in his lower abdomen at a level of 6-7 out of 10. I contacted Dr. Barber, who issued medical orders to discontinue the Indocin. I also placed Plaintiff on the list to see the doctor.

On September 29, 2017, Plaintiff was brought to the Jail medical office, where he was seen by Nurse Brittany Mullen. Plaintiff complained of a headache. His blood glucose was 109, blood pressure was 172/102. Nurse Mullen called me, and I contacted Dr. Barber, who issued medical orders for Clonidine 0.1 mg by mouth, as needed. After administering the Clonidine, Nurse Mullen rechecked Plaintiff's blood pressure, which had decreased to 168/98.

On September 30, 2017 Plaintiff submitted a sick call request stating, "I am in need of immediate care for rash due to it affecting my breathing & I have prn in my file for care for this condition, also need to see dr for this, and the other medical problems I have been refused treatment for hand copy made with witnesses" (*sic*).

Plaintiff submitted a second sick call request on September 30, 2017, stating, "rash still bad, nothing done for it, itching, also was one blood pressure pill short at pm pill call, as per dr price orders" (*sic*).

During the month of September, 2017, pursuant to medical orders from the medical director/provider and Plaintiff's outside specialists, the SHP medical staff provided Plaintiff with the following medications: ASA (aspirin, for heart disease), Tylenol (for pain), Flexeril (muscle relaxaer), Bentyl (for abdominal pain), lisinopril (for hypertension and heart disease), Indocin (anti-inflammatory), Clonidine (for blood pressure), gabapentin (for nerve pain), paroxetine (for depression and anxiety), humulin injection (for diabetes), Xopenex inhaler (for COPD), Zyrtec (for acid reflux), T gel shampoo (for head rash), Aleve (anti-inflammatory and pain), diphenhydramine/lidocaine/nystatin ointment, topiramate (for skin rash), pantoprazole sodium(for acid reflux), hydroxyzine pamoate antihistamine [(for rash, itching)[], budesonide nebulizer (for COPD), Tamsulosin (for enlarged prostrate), clopidogrel bisulfate (for heart disease), isosorbide (for heart disease), and albuterol sulfate nebulizer (for COPD).

I saw Plaintiff in the Jail medical office on October 1, 2017 for complaints of itching and a rash. I completed a clinical pathway form. Plaintiff's blood pressure was 130/70, pulse was 102, respirations were 22, oxygen saturation was 99%, and temperature was 97.3 degrees. He was alert,

oriented, calm and cooperative and his pupils were equal and reactive. His abdomen was soft, and his respirations were even and unlabored. I observed a petechial rash on his face. I informed him that I knew he had been rubbing his skin with a dry washcloth to make the rash come up. He became upset, then stated that his prosthesis was leaking, and he claimed that this was a life-threatening emergency. I told him that it was not an emergency, and he became increasingly upset. I informed him that he would have to wait until I could notify UAB because the doctors in Andalusia would not see him for this problem. I informed Plaintiff that he was on the list to see the doctor at the next jail visit. Plaintiff began cursing and stated, "That damn doctor I'm going to [sue] her too".

Plaintiff made no further complaints of a rash after October 1, 2017.

On October 1, 2017, Dr. Barber resigned as the Medical Director/Provider for the Jail. Dr. Jason Junkins assumed the responsibilities of Medical Director/Provider at that time.

On October 5, 2017, Plaintiff submitted a sick call request, stating "I am hurting bad in my lower back going [t]o my left leg, & in my neck to my shoulder, my urine has been cloudy last few times I used it, the knot is still in my stomach, my pothesis is leaking, still having hard time swallowing"(*sic*).

I saw Plaintiff in the Jail medical office on October 6, 2017. I completed a clinical pathway form. Plaintiff informed me that he was having abdominal cramping, and that his pain level was 8 out of 10. His blood pressure was 120/80, pulse was 70, respirations were 20, oxygen saturation was 97%, and temperature was 97 degrees. He was alert, oriented, calm and cooperative and his pupils were equal and reactive. His abdomen was soft, and his respirations were even and unlabored. I informed him to notify nursing if his condition worsened.

On October 6, 2017, I contacted Dr. Junkins, who issued medical orders for Imdur (for chest pain), 60 mg. by mouth, one tablet per day. He also issued orders for Bentyl (anti-spasmodic), 20 mg, one tablet by mouth twice per day for five days, and Tylenol 650 mg by mouth twice per day for five days.

. . . .

Doc. 26-5 at 2–17 (paragraph numbering omitted).

In her affidavit, Dr. Pamela Barber, a board certified internist, states, in relevant part, as follows:

> From October 7, 2015 to October 1, 2017, I had a contract with Southern Health Partners, Inc. ("SHP") to be the Medical Director/Provider of the Covington County Jail in Andalusia, Alabama ("the Jail"). I resigned on October 1, 2017, because of other professional obligations.

> SHP provides medical care to inmates in various jail facilities, including the Jail. During the entire time of Plaintiff's incarceration in the Jail, health care services have been provided to the inmates by SHP pursuant to a contract between SHP and the Covington County Commission. Health care in the Jail is provided by a team of nurses under the direction of a medical team administrator as well as a Medical Director/Provider.

> When an inmate in the Jail requires routine medical care, he or she obtains an inmate sick call slip from the corrections officer on duty in the housing unit, and that form is provided to the medical staff for action. Routine sick calls are conducted by the medical staff inside the housing unit.

> Nurses in the Jail are authorized to provide medical treatment to inmates according to established treatment protocols and to administer medication by implementing standing orders under the direction of the Medical Director. The Medical Director is available to the nurses at all times for consultation. If a patient requests or needs to be seen by a doctor, a nurse will place the patient on the Provider list and will set aside the patient's chart for the Medical Director/Provider to review. On his or her next visit to the Jail, the Medical Director/Provider will review the patient's charts and review the treatment provided by the nurses. The Medical Director/Provider will determine which patients need to be seen, and will see those patients in the Jail medical office. In the event that any changes need to be made to an inmate's medical treatment, the Medical Director/Provider will enter appropriate medical orders at that time. The nurses then implement his or her medical orders.

> Plaintiff was assigned to the "Chronic Care Clinic". Through the Chronic Care Clinic process, patients with certain chronic medical conditions such as hypertension, diabetes, and seizures are seen in the Jail medical office on a regular basis, at intervals established by the Medical Director. Pursuant to my orders, Chronic Care patients were seen once per month by a nurse and at four or six-month intervals by me. At the monthly Chronic Care visit, the nurse checks the patient's vital signs, and I review the chart to assess the degree of control of the patient's chronic condition and to make any necessary adjustments to the patient's medications and treatment.

I personally saw the Plaintiff in the Jail medical office on numerous occasions, including sick call visits as well as during Chronic Care Clinic. I did not personally see him every time he submitted a request. Rather, I exercised my professional medical judgment upon reviewing his chart and by speaking with the nurses to evaluate whether Plaintiff needed to be seen by a doctor at that time. On the occasions when I came to the Jail and did not see Plaintiff, it was because in my professional medical opinion, he did not need to be seen by a doctor at that time.

Between the times I have personally seen Plaintiff, I have periodically reviewed his records and evaluated his vital signs, his blood sugar test results, and his blood pressure readings, as well as the nurses' notes regarding their observations of his condition. I have also periodically reviewed his medications and treatment regimens, and I have made adjustments and issued medical orders as I deemed appropriate in the exercise of my professional medical judgment. I have ordered and reviewed outside laboratory testing, x-rays, and other procedures. I have also had him sent to the emergency room, and I have referred him for outside consultation with several medical specialists.

I have never provided medical treatment to Plaintiff in a hospital setting or in any other setting outside of the Covington County Jail.

I have at times issued medical orders for Tylenol for Plaintiff for pain, but I have never ordered it for treatment of his hepatitis C.

During the two years that I treated Plaintiff in the Jail, I monitored him through laboratory testing for hepatitis C. As I have explained to Plaintiff, his condition is chronic and asymptomatic, and it has remained relatively stable. In my professional medical opinion, initiation of medical treatment for this condition was neither medically warranted nor medically necessary while Plaintiff was incarcerated in the Jail.

During Plaintiff's incarceration in the Jail, he has been provided medical attention for all medical conditions as submitted on sick call slips listed in Plaintiff's medical record. He has never been refused timely and appropriate medical treatment by myself, or by the SHP medical staff.

I have never denied Plaintiff access to his medical records or any other documents. As the Medical Director/Provider, I was not a custodian of the medical records of inmates. It is my understanding that SHP has custody of inmate medical records, and has a policy that allows inmates to request copies of their records by sending a release and request to SHP.

> Based on my education, training and experience, my personal examinations and treatment of Plaintiff, it is my professional medical opinion that he has received extensive, prompt and appropriate medical treatment for all of his medical complaints.  All of his medical attention has been within the standard of care.  Moreover, it is further my opinion that no act or failure to act by me or any member of the medical staff proximately caused any injury to the Plaintiff.  On no occasion was the Plaintiff ever at risk of serious harm, nor was I or any member of the SHP medical staff ever indifferent to any complaint that he has made.

Doc. 25-6 at 2–6 (paragraph numbering omitted).

Under the circumstances of this case, the undersigned concludes that the course of treatment undertaken by the medical defendants did not violate Foster's constitutional rights as it was not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness."  *Harris*, 941 F.2d at 1505. Although Foster alleges that the defendants should have ordered additional diagnostic tests to assist in diagnosing his health issues, whether the defendants "should have [approved] additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal citation omitted); *Garvin*, 236 F.3d at 898 (holding that difference of opinion regarding manner in which to address a medical complaint fails to demonstrate a constitutional violation); *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Howell v. Evans*, 922 F.2d 712, 721 (11th Cir. 1991) (The failure of medical personnel to  pursue alternative means of treating inmate's condition does not "rise beyond negligence to the level of [deliberate indifference]."); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).  As is also clear, the mere failure of

the medical defendants to refer Foster to outside specialists on a more frequent basis did not constitute deliberated indifference. *Amarir*, 243 F.A'ppx at 354. In addition, Foster has failed to present any evidence which indicates that the medical defendants knew that the manner in which they provided treatment to him created a substantial risk to Foster's health and, with this knowledge, consciously disregarded that risk. The record is therefore devoid of evidence showing that the medical defendants acted with deliberate indifference to Foster's medical needs. Moreover, no evidence before the court demonstrates that the medical treatment provided to Foster was not objectively reasonable. Consequently, summary judgment is due to be granted in favor of defendants SHP, Craft and Barber on Foster's claim of deliberate indifference to his medical needs.

**2. Jail Administrator Alan Syler**

It is clear from the evidentiary materials submitted by the defendants that Jail Administrator Alan Syler is not in any way involved in decisions regarding medical treatment provided to inmates. To the extent that the complaint can be construed to assert that Administrator Syler acted with deliberate indifference because he did not intervene in the treatment furnished by the health care professionals employed at the Covington County Jail, this assertion entitles Foster to no relief.

Foster has failed to establish deliberate indifference on the part of defendant Syler as he has not demonstrated that Syler consciously disregarded any known serious risk to Foster's health due to his myriad of health conditions. *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (holding that for liability to attach, the official must know of and then disregard an excessive risk of harm to the inmate); *Quinones*, 145 F.3d at 168 (holding that defendant must have actual knowledge of a serious condition, not just knowledge of

symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).   The failure to alleviate significant risk that officer "should have perceived but did not" does not constitute deliberate indifference.  *Farmer*, 511 U.S. at 838.

Insofar as Foster seeks to hold defendant Syler liable for the treatment provided by medical professionals, he is likewise entitled to no relief as

> "[t]he law does not impose upon [jailers] a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong.  *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment).  Moreover, "supervisory [jail] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care.  *See, e.g., Durmer v. O'Carroll*, 991 F.2d 64, 69 (3rd Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988)."  *Williams v. Limestone County, Ala.,* 198 Fed.Appx. 893, 897 (11th Cir. 2006).

*Cameron v. Allen*, et al., 525 F.Supp.2d 1302, 1307 (M.D. Ala. 2007).

Finally, to the extent that Foster seeks to hold defendant Syler liable under the theory of respondeat superior, he is entitled to no relief as the law is well-settled that liability in a 42 U.S.C. § 1983 action may not be based on the theory of respondeat superior or vicarious liability.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of respondeat superior."); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("[O]fficials are not liable under § 1983 for the unconstitutional acts of their subordinates [or co-workers] on the basis of respondeat superior or vicarious liability."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concljding officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th

Cir. 1999), citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (holding 42 U.S.C. § 1983 does not allow a plaintiff to hold officials liable for the actions of other officials under either a theory of respondeat superior or vicarious liability.). "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. Thus, liability could attach to defendant Syler only if he "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [his] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360. Since defendant Syler did not participate in the provision of medical treatment to Foster, the court will address whether a causal connection existed.

To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of defendant Syler, Foster must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [defendant Syler] on notice of the need to correct the alleged deprivation, and [he] fail[ed] to do so" or "a . . . . custom or policy [that] result[ed] in [the alleged constitutional violation], or . . . facts [that] support an inference that [Syler] directed [the medical defendants] to act unlawfully, or knew that [they] would act unlawfully and failed to stop [them] from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted). After extensive review of the pleadings and evidentiary materials submitted in this case, the court concludes that Foster has failed to meet this burden.

The record before the court contains no evidence to support an inference that defendant Syler directed the medical defendants to act unlawfully or knew that they would act unlawfully and failed to stop such action. In addition, Foster has presented no evidence of obvious, flagrant or rampant abuse of continuing duration in the face of which Syler

failed to take corrective action.  Finally, the records before the court demonstrate that the medical defendants did not act pursuant to a policy enacted by Syler when providing medical treatment to Foster; instead, they provided treatment to him in accordance with their professional judgment.  Thus, the requisite causal connection does not exist in this case as to defendant Syler and his liability under the custom or policy standard is likewise not justified.  Moreover, "[i]n light of the Court's determination that there was no constitutional deprivation, there is no basis for supervisor liability."  *Nam Dang*, 871 F.3d at 1283, citing *Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008); *Beshers v. Harrison*, 495 F.3d 1260, 1264 n.7 (11th Cir. 2007).  For the foregoing reasons, summary judgment is due to be granted in favor of defendant Syler on the medical treatment claims.

## B.  General Jail Conditions

Foster alleges that conditions to which he was subjected at the Covington County Jail violated his constitutional rights.  Specifically, Foster complains that defendant Syler did not ensure that inmates housed in the medical unit received adequate outdoor exercise with access to fresh air, refused him access to his medical records, and did not provide proper seating in the visitation area causing him to sit on a plastic crate which broke.  Defendant Syler denies that the conditions challenged by Foster violated his constitution rights.  In response to Foster's complaint, Syler states that:

> Due to various chronic health issues Plaintiff experienced during his time in the Covington County Correctional Facility, Plaintiff was housed in the medical unit of the jail.
>
> The medical unit is approximately 30 ft. x 30 ft, contains 10 beds, and houses an average of six to eight inmates at a time. At the time of the execution of this affidavit, there are seven inmates housed in the medical unit.

Residents of the unit are taken outside usually two to three times a week if conditions permit. Residents are usually outside for 15 to 30 minutes at a time.

This time outside the unit is in addition to any time the resident would need to leave the unit to visit a nurse or doctor within the jail, see a specialist outside of the jail, or attend weekly church services conducted in other parts of the jail.

Plaintiff would typically see a nurse or doctor within the jail at least once a week.

Also, because of Plaintiff's various health issues, he had to frequently be taken to different health specialists around the state. As an example, in the last two months of Plaintiff's incarceration at the Covington County Correctional Facility, he was taken to see specialists outside the jail three or four times. These incidents included trips to Birmingham and Monroeville.

Residents of the medical unit are not allowed to walk the halls outside of the medical unit, because, among other reasons, the medical unit is across the hall from the women's unit.

Jail staff typically do not have access to inmates' medical records. Medical records are maintained by Southern Health Partners.

Plaintiff's wife contacted Andalusia Health, also known as Andalusia Regional Hospital, and had his medical records from the hospital mailed to Plaintiff at the jail. When the records were received at the jail, the jail's clerks forwarded them to Southern Health Partners staff.

The medical records have remained in the possession of Southern Health Partners. I have never seen or possessed these records.

. . . .

Doc. 25-1 at 2–3 (paragraph numbering omitted).

Only conditions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Eighth Amendment proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain. *Id.* at 346.

Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Id*. at 348 (citation omitted). Jail conditions which may be "restrictive and even harsh, [ ] are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment. *Id*. Conditions, however, may not be "barbarous" nor may they contravene society's "evolving standards of decency." *Id*. at 345–46. "[T]he Constitution does not mandate comfortable prisons." *Id*. at 349 (internal quotations omitted). Conditions that "are merely restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society. Generally speaking, prison conditions rise to the level of an Eighth Amendment violation only when they involve the wanton and unnecessary infliction of pain." *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (internal quotations and citations omitted). Although the Constitution "does not mandate comfortable prisons . . . neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes*, 452 U.S. at 349). Thus, it is well-settled that the conditions under which an inmate is confined are subject to constitutional scrutiny. *Helling v. McKinney*, 509 U.S. 25 (1993).

A jail official has a duty under the Eighth Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)); *Helling*, 509 U.S. at 31–32. For liability to attach, the challenged jail condition must be "extreme" and must pose "an unreasonable risk of serious damage

to [the inmate's] future health." *Crosby*, 379 F.3d at 1289–90. As previously recognized, to demonstrate an Eighth Amendment violation regarding conditions of confinement, a prisoner must satisfy both an objective and a subjective inquiry. *Farmer*, 511 U.S. at 834. With respect to the requisite objective elements, an inmate must first show "an objectively substantial risk of serious harm . . . exist[ed].  Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh*, 268 F.3d 1028–29.   As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . .  The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'  . . .  [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 837–38; *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same).  The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . .  It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause[.]" *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

The living conditions within a jail will constitute cruel and unusual punishment when the conditions involve or result in "wanton and unnecessary infliction of pain, [or] . . . [are] grossly disproportionate to the severity of the crime warranting imprisonment."

*Rhodes,* 452 U.S. at 347. "Conditions . . . alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency. . . . But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Id*. at 347.

In a case involving conditions of confinement generally, or several different conditions, the court should consider whether the claims together amount to conditions which fall below constitutional standards. *Hamm v. De Kalb County*, 774 F.2d 1567 (11th Cir. 1985), *cert. denied Hamm v. De Kalb County*, 475 U.S. 1096 (1986); *see also Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991). The court's consideration of whether the totality of a plaintiff's claims amount to conditions which fall below applicable constitutional standards is limited by the Supreme Court's admonishment that "*[s]ome* conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need. . . . To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes. Nothing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter,* 501 U.S. 294, 304–05 (1991) (emphasis in original) (internal quotation marks omitted).

The law is clear that establishment of both objective and subjective elements are necessary to demonstrate an Eighth Amendment violation. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014). With respect to the requisite objective

elements of a deliberate indifference claim, an inmate must first show "an objectively substantial risk of serious harm . . . exist[ed]. Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh*, 268 F.3d at 1028–29. As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 837–38; *Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same). The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause[.]" *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer*, 511 U.S. at 834–38, 114 S.Ct. at 1977–80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991). . . . Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists — and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).   A defendant's subjective knowledge of the risk must be specific to that defendant because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. . . .   Each individual Defendant must be judged separately and on the basis of what that person [knew at the time of the incident]." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). Moreover, "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotation marks omitted).   Thus, mere negligence does not justify liability under section 1983. *Id*.

Despite Foster's allegations regarding sporadic outdoor exercise, a one-time lack of adequate seating at visitation and a lack of access to his medical records, he does not establish that the challenged conditions denied him the minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of pain. *Wilson*, 501 U.S. at 298–299; *Rhodes*, 452 U.S. at 347.   The conditions referenced by Foster, though perhaps uncomfortable, inconvenient, unpleasant and/or objectionable, were not so extreme as to violate the Constitution. *See Rhodes*, 452 U.S. at 346; *Chandler*, 379 F.3d at 1289. Furthermore, Foster fails to demonstrate deliberate indifference or reckless disregard by defendant Syler with respect to his health or safety relative to these conditions. Specifically, Foster has failed to present any evidence which indicates that defendant Syler knew his administration of the jail created a substantial risk to Foster's health or safety and, with this knowledge, consciously disregarded such risk.   Consequently, summary judgment is due to be granted in favor of defendant Syler on the conditions claims lodged against him.

Finally, to the extent that Foster's claim regarding lack of access to this medical records can be construed as arising under the Due Process Clause of the Fourteenth Amendment, he is likewise entitled to no relief.  While inmates have a well-established constitutional right of access to adequate medical care, *Estelle,* 429 U.S. at 104–105, they have no concomitant constitutionally protected right of review, or access to, their medical records.  Other courts to address this issue have determined that inmates have no interest protected by the Fourteenth Amendment regarding access to their inmate medical records. *See Gotkin v. Miller*, 514 F.2d 125, 129 (2d Cir. 1975) (holding that the Fourteenth Amendment does not create "a constitutionally protected, unrestricted property right directly to inspect and copy [one's own] hospital records"); *Brannon v. Thomas County Jail*,  2007 WL 1701815, at *10 (M.D. Ga. June 7, 2007) (finding "[t]here is no *per se* 'constitutional right' to have a jail or prison facility provide a prisoner with a copy of his medical records."), *aff'd* 280 F.App'x 930 (11th Cir. 2008); *Ramirez v. Delcore*, 2007 WL 2142293, at *7 (S.D. Tex. July 25, 2007), (finding "Defendants' failure to produce [inmate's] medical records, while frustrating, does not pose the type of atypical hardship that raises due process protections"), *aff'd* 267 F.App'x 335 (5th Cir. 2008); *Dunn v. Corrections Corp. of America*, 2010 WL 2817264, at * 3 (S.D. Ga. June 15, 2010) (finding a prisoner does not have a general constitutional right to access his medical records); *Martikean v. United States*, 2012 WL 1986919, at *4 (N.D. Tex. Apr. 6, 2012) (emphasis in original) (finding "there is no *constitutional* requirement that an inmate be given the right to review or obtain his prison medical records"); *Osborne v. City of Marietta*, 2009 WL 10690033, at *3 (N.D. Ga. Apr. 10, 2009) (finding "individuals do not have a constitutionally protected property interest in their medical records maintained by health

care providers"); *Cannon v. Mason*, 2009 WL 588581, at *3 (E.D. Okla. Mar. 6, 2009) (finding inmate had no constitutional right to review his medical records); *Head v. Bailly*, 2019 WL 1779340, at *3 (D. N.M. Apr. 23, 2019) (finding that denying inmate access to review of his medical records did not constitute a constitutional violation). Based on the foregoing, there is no due process claim available to Foster regarding his not receiving copies of his medical records.

## V.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motions for summary judgment be GRANTED.

2.  Judgment be GRANTED in favor of the defendants.

3.  This case be dismissed with prejudice.

4.  Other than the filing fee assessed to the plaintiff in this case, no costs be taxed.

On or before **March 19, 2021** the parties may file objections to this Recommendation. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and legal conclusions set forth in the Recommendations of the Magistrate Judge shall bar a party from a *de novo* determination by the District Court of these factual findings and legal conclusions and shall "waive the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993)("When the magistrate provides such notice and a

party still fails to object to the findings of fact and those findings are adopted by the district court the party may not challenge them on appeal in the absence of plain error or manifest injustice."); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE, on this the 5th day of March, 2021.

/s/ Susan Russ Walker
Susan Russ Walker
United States Magistrate Judge

49